UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

ROLAND ANNAN,

    Plaintiff,

v.

CAPITAL ONE BANK,

    Defendant.

Civil Action No. TDC-19-1329

## MEMORANDUM OPINION

Plaintiff Roland Annan, a former branch manager for Capital One Bank ("Capital One"), has filed suit against Capital One alleging four state law causes of action: breach of contract, wrongful discharge, retaliatory wrongful discharge, and intentional infliction of emotional distress. Capital One has moved for summary judgment on all of Annan's claims. Annan opposes the Motion. Having reviewed the briefs and submitted materials, the Court finds no hearing necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, Capital One's Motion for Summary Judgment will be GRANTED.

## BACKGROUND

Annan began working for Capital One in July 2003, and by approximately 2008, was the manager of the Capital One branch on Georgia Avenue in Silver Spring, Maryland. Annan's employment was at-will. In his role as branch manager, Annan was responsible for reporting any suspected fraud by a customer or bank employee. In addition, Capital One's Code of Business Conduct and Ethics ("the Code") required employees to report illegal or unethical behavior and to report any suspected or potential violation of the Code. Included in violations of the Code was

money laundering. The Code also required that employees not "search for, access or modify accounts held by themselves, friends, or relatives." Joint Record ("J.R.") 111, ECF No. 30. The Code specified that noncompliance with its terms could result in disciplinary action, including termination. The Code expressly provided that it was "not intended to be an employment contract and does not alter the terms and conditions of ... employment, which is at-will." J.R. 104.

## I. Complaints of Unlawful Activity

In 2018, Annan verbally complained to his supervisor, Ahmed Akbari, and to Akbari's assistant, Marva Bobo, about what he believed to be fraudulent practices at other Capital One branches. Specifically, Annan asserted that bank employees were creating bogus client accounts to meet monthly quotas for new accounts by opting customers into certain agreements without their consent. Annan also made an anonymous complaint about these alleged practices to Capital One's ethics hotline, which was operated by an external company, not by Capital One. Akbari and Bobo deny that Akbari ever made any such complaints to them, and there are no emails or other documentary evidence memorializing these complaints.

Annan also complained to management about the fact that employees from his branch generally were not paid to attend a quarterly district event held on a Saturday to reward a branch employee as the "MVP" for the quarter, despite the fact that employees from other branches were paid to attend. J.R. 42. Annan asserted that Akbari instructed him not to nominate anyone for the award who did not intend to show up for the event. Annan has identified no emails or other documentary evidence memorializing these complaints.

## II. Money Laundering Investigation

Annan, a naturalized United States citizen, emigrated to the United States from Ghana in 1998, and he and his wife both continue to have extensive family connections to Ghana. In 2017

2

and 2018, Mabel Asafu-Adjaye, Annan's wife's cousin, owned a small store in Accra, Ghana that sold largely non-perishable goods. Asafu-Adjaye's business partner, Shirley Addo, ran a similar store in Accra. Between 2017 to 2018, Annan repeatedly made purchases of over $10,000 at Sam's Club for Asafu-Adjaye and Addo, which he paid for with his Capital One credit card. These purchases consisted of nonperishable items such as diapers and tissues. Typically, Asafu-Adjaye selected the items to be loaded into a shipping container, and Annan arrived at the end to provide his credit card for the transaction. Annan was unsure how the goods were then transported away from Sam's Club and ultimately to Ghana. From July 2017 through June 2018, Annan made 13 purchases at Sam's Club, totaling $285,860.73. Asafu-Adjaye and Addo reimbursed Annan for the purchases by personal check, cashier's check, or cash. Asafu-Adjaye made one payment to Annan's credit card account in the amount of $26,663 with a cashier's check that had been funded with a cash deposit. Addo made a total of $70,511 in cashier's check payments to Annan's credit card account, with those cashier's checks also funded with cash. Addo also made a $10,000 payment to Annan's credit card account from a Bank of America account. Annan himself made cash payments on his credit card account totaling $57,653. Federal law requires banks to report any cash transaction over $10,000, a rule of which Annan was aware. Annan never asked Asafu-Adjaye or Addo about the source of the funds used to reimburse him, because he assumed the money came from their stores in Ghana.

On June 12, 2018, a $30,000 cashier's check paid for with funds from a Capital One account held by Addo was issued at the Silver Spring branch. According to Annan, Addo came to the branch to obtain the check, but Annan had another bank employee process the transaction because, according to the Code, he could not be involved in transactions for friends or family. However, video surveillance from that day did not show Addo entering or exiting the branch before

3

or after the transaction, and the signature on the withdrawal slip did not match the record signature on Addo's account.

Meanwhile, on June 6, 2018, Capital One's Ethics and Investigation Team received a referral from the Anti-Money Laundering Financial Intelligence Team about the activity on Annan's Capital One credit card. Matthew Caballero, a Capital One Anti-Money Laundering Senior Investigator, interviewed Annan multiple times about the activity on his account. In one of those interviews, Caballero asked Annan if he could provide documentation of the arrangement with Asafu-Adjaye and Addo, such as receipts from Sam's Club and shipping records. In a July 16, 2018 interview, Annan provided one receipt from Sam's Club, one bill of lading from Sam's Club, and one shipping document from Ghana.

Any individual who transports, mails, or ships over $10,000 in currency into the United States, and any person receiving over $10,000 in currency that may have been transported, mailed, or shipped into the United States, must file a Report of International Transportation of Currency or Monetary Instruments ("FinCEN Form 105"). Travelers transporting cash into the United States must declare it at the time of entry; recipients of such transported funds must declare it within 15 days after receipt. Accordingly, in one of the interviews Caballero asked Annan to provide copies of the FinCEN Forms 105 relating to the various cash payments from Asafu-Adjaye and Addo to him. Annan has acknowledged that Asafu-Adjaye and Addo never gave him any documentation reflecting that they had reported the transporting of cash into the United States, and Annan never asked them if they had declared the funds. Annan thus was unable to provide any documentation of the source of the funds or that any of the cash involved in the payments to his credit card account had been declared to any federal agency.

4

Based on this investigation, Capital One made the decision to terminate Annan. On July 26, 2018, Annan was terminated by Akbari, with Carrie Zambrana, a district operations consultant, as a witness. According to Annan, at that time, Akbari stated that Annan was being terminated but that "we can't give you any reason." J.R. 31. As part of the termination process, Annan was asked a series of standard questions, including whether he had ever expressed a concern that any Capital One process, product, or practice harms customers, fails to benefit customers, creates a negative customer experience, or violates the law or regulator guidance. He answered "no" to all such questions. There is no evidence that any member of the Ethics and Investigation Team was aware of any of Annan's verbal complaints about either fraudulent practices or unpaid attendance at district events prior to the initiation of the money laundering investigation or Annan's termination.

After this termination, Capital One canceled two of Annan's credit cards, which had a combined credit limit of $70,000. According to Annan, this action had an adverse impact on his credit score. Because Annan was terminated on a Thursday, he was not paid for the following Friday, nor did he receive payment for his vacation days. Annan reports that the stress of the termination from a job he had for 15 years made him contemplate suicide. However, Annan never consulted a psychiatrist, psychologist, therapist, or doctor about his emotional distress.

### III. Procedural History

After his termination, Annan filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), alleging a retaliatory discharge. Annan withdrew that charge prior to the EEOC's investigation.

On February 7, 2019, Annan filed suit against Capital One in the Circuit Court for Prince George's County, Maryland asserting four counts: (I) breach of contract; (II) common law

wrongful discharge in violation of public policy; (III) common law retaliation in violation of public policy; and (IV) intentional infliction of emotional distress. Capital One removed the case to this Court on the basis of diversity jurisdiction. *See* 28 U.S.C. § 1332 (2018). Capital One now moves for summary judgment on all of Annan's claims.

## DISCUSSION

In its Motion, Capital One asserts that Annan's breach of contract claim fails as a matter of law because he was an at-will employee, such that his termination was not a breach of any contract. As to Annan's wrongful discharge claim, Capital One asserts that the record fails to establish any plausible causal connection between Annan's termination and any purportedly protected conduct in which he engaged. Capital One contends that Annan's claim for retaliation fails because Maryland recognizes no such cause of action. Lastly, Capital One asserts that the facts in the record are insufficient to support an intentional infliction of emotional distress claim.

In opposing the Motion, Annan asserts that there are material disputes of fact whether his discharge was in retaliation for his complaints about alleged illegal conduct by other bank employees and whether that termination amounted to the intentional infliction of emotional distress. Annan does not oppose Capital One's arguments as to breach of contract and thus appears to have abandoned that claim.

### I.  Legal Standard

Under Federal Rule of Civil Procedure 56, the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is "genuine" only if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248-49.

## II.    Breach of Contract

Annan has failed to oppose Capital One's Motion as to his breach of contract claim and so must be construed as abandoning it. *See Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trustees*, 558 F.3d 731, 735 (8th Cir. 2009) (holding that a "failure to oppose a basis for summary judgment constitutes waiver of that argument"); *Mentch v. Eastern Sav. Bank, FSB*, 949 F. Supp. 1236, 1247 (D. Md. 1997) (finding that the plaintiff had abandoned a claim "by failing to address that claim in her opposition to [the defendant's] motion for summary judgment, or to offer clarification in response to [the defendant's] reply brief").

Even if Annan had not abandoned the claim, it would fail as a matter of law. Annan concedes that he was an at-will employee, and in Maryland, an employer may terminate an at-will employment relationship for any reason, even one "that is arbitrary, capricious, or fundamentally unfair." *Towson Univ. v. Conte*, 862 A.2d 941, 949 (Md. 2004). One exception to this rule is where the reason for the termination contravenes public policy, *id.*, in which case the cause of action is not for breach of contract, but for wrongful discharge, which Annan alleges in Count II of his Complaint. *See Wholey v. Sears Roebuck*, 803 A.2d 482, 488 (Md. 2002) ("The tort of wrongful discharge is one exception to the well-established principle that an at-will employee may

7

be discharged by his employer for any reason, or no reason at all."). Capital One's Motion will therefore be granted as to Count I.

## III. Wrongful Discharge

Annan asserts that he was wrongfully terminated in contravention of public policy based on his reporting that certain bank employees were engaged in illegal transactions. On such a wrongful discharge claim, a plaintiff must establish that (1) the employee was discharged; (2) the alleged basis for discharge violated some clear mandate of public policy; and (3) there is a nexus between the employee's conduct and the decision to fire the employee. *Wholey*, 803 A.2d at 489.

There is no dispute that Annan was discharged and thus that the first element is satisfied. Annan's claim, however, fails at the second element. While Maryland courts recognize a claim for wrongful discharge for whistleblowers terminated for reporting illegal conduct occurring within their company, in *Wholey*, the Court of Appeals of Maryland held that "to qualify for the public policy exception ... the employee must report the suspected criminal activity to the appropriate law enforcement or judicial official, not merely investigate suspected wrong-doing and discuss that investigation with co-employees or supervisors." *Id.* at 496, 499.

Here, Annan's own deposition testimony establishes that any complaints he made about alleged illegal conduct were made at most only to his supervisor, his supervisor's assistant, and to the Capital One anonymous ethics hotline which, although it was not internal to Capital One, was run by another company, not by any law enforcement agency. Annan's own evidence thus establishes that he failed to report the suspected criminal activity to law enforcement or a judicial official. *See id.* at 496. Notably, there is no evidence that the money laundering investigation leading to Annan's termination was launched because of his complaints, or that the investigator conducting that inquiry was even aware of Annan's complaints.

8

As for Annan's complaint about the failure to pay Silver Spring branch employees for attending the awards ceremony, Annan has not identified a recognized public policy thwarted by any termination based on such a complaint about non-criminal activity. *See id.* at 489–90, 493 (finding that a public policy exception applies only when there is a "clear mandate of public policy" embodied in "constitutional or statutory provisions" and thus finding a public policy exception for whistleblowers only as to the reporting of criminal activity, where Maryland has a statute barring retaliation for reporting criminal activity but otherwise lacks a statutory remedy for private sector whistleblowers). His wrongful discharge claim therefore fails as a matter of law. Capital One's Motion will be granted as to Count II.

## IV.   Retaliation

Based on the allegations in the Complaint, Annan's third count replicates his second count in that it alleges wrongful discharge based on retaliation for whistleblowing activity and thus fails for the same reasons. To the extent that Annan believes that he has alleged a conceptually distinct common law cause of action for retaliation, the Court finds no basis to recognize such a claim. *See Holley v. DTM Corp.*, No. AW-09-1160, 2010 WL 3221841, at *5 (D. Md. Aug. 13, 2010) ("[T]he Court observes that it is unaware of any cause of action for 'retaliation' under Maryland common law."). In his memorandum in opposition to Capital One's Motion, Annan cites *Manikhi v. Mass Transit Administration*, 758 A.2d 95 (Md. 2000), for the elements of his claim. *Manikhi*, however, involved a claim of retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e–2000e-17 (2018). *Manikhi*, 758 A.2d at 103–04. *See, e.g. Davidson-Nadwodny v. Wal-Mart Assocs., Inc.*, No. CCB-07-2595, 2008 WL 2415035, at *3 (D. Md. June 3, 2008) (construing a plaintiff's claims as based on Title VII "[b]ecause there do not appear to be viable Maryland common law claims for sexual harassment and retaliation"). Where Annan's

9

Complaint made no mention of Title VII, the Court cannot consider this new theory of liability. "It is well-established that parties cannot amend their complaints through briefing or oral advocacy." *Southern Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013).

Even if the Court were to consider it, the claim would fail because, as Annan's testimony establishes, he withdrew his EEOC charge of discrimination and has not exhausted administrative remedies. *See Fort Bend Cty. v. Davis*, ___ U.S. ___, 139 S. Ct. 1843, 1851 (2019) (noting that Title VII requires "complainants to submit information to the EEOC and to wait a specified period before commencing a civil action"). Moreover, he has not demonstrated how complaining about illegal conduct by co-workers constituted protected activity under Title VII, which consists of opposing discrimination based on membership in a specific protected class. 42 U.S.C. §§ 2000e-3(a). Capital One's Motion will therefore be granted as to Count III.

## V.    Intentional Infliction of Emotional Distress

In Count IV, Annan asserts that his termination from Capital One amounted to intentional infliction of emotional distress ("IIED"). In Maryland, an IIED claim has four elements: "(1) [t]he conduct must be intentional or reckless; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between the wrongful conduct and the emotional distress; [and] (4) the emotional distress must be severe." *Manikhi*, 758 A.2d at 113 (quoting *Harris v. Jones*, 380 A.2d 611, 614 (Md. 1977)). The second element is especially onerous. "For conduct to be 'extreme and outrageous,' it must 'go beyond all possible bounds of decency and ... be regarded as atrocious, and utterly intolerable in a civilized community.'" *Kohler v. Shenasky*, 914 F. Supp. 1206, 1212 (D. Md. 1995) (quoting *Harris*, 380 A.2d at 611).

10

Here, the record establishes that Capital One terminated Annan after an internal investigation into his financial dealings based on multiple transactions involving significant quantities of cash transported internationally. Although the evidence does not establish that Annan was actually engaged in illegal money laundering, Capital One's initiation of the investigation was reasonable in light of the high-dollar cash transactions. The investigation then revealed that Annan could not provide certain documentation relating to some of those financial transactions, and there was at least some evidence suggesting that he violated the Code by assisting with a cash transaction for a relative or friend. On such a record, the Court concludes that no reasonable jury could find that Capital One's conduct and decision to terminate Annan was extreme and outrageous such that it amounted to the intentional infliction of emotional distress. *See, e.g. Continental Casualty Co. v. Mirabile*, 449 A.2d 1176, 1185 (Md. Ct. Spec. App. 1982) (holding that allegations that supervisors made "negligent, false, and malicious statements" in the plaintiff's performance review were inadequate to support an IIED claim); *Beye v. Bureau of Nat'l Affairs*, 477 A.2d 1197, 1204-05 (Md. Ct. Spec. App. 1984) (holding that allegations that the plaintiff's supervisors gave him poor performance ratings, threatened to fire him, harassed him, physically assaulted him, passed him over for promotion, and deceived him into resigning were not sufficient to state an IIED claim). Further, the record establishes that, although Annan certainly was emotionally impacted in the wake of what he considered to be an unjust termination, his suffering was not so extreme as to merit any consultation with a medical professional. There is thus no basis for a jury to conclude that Annan's emotional distress was "so severe that no reasonable [person] could be expected to endure it." *Harris v. Jones*, 380 A.2d 611, 616 (Md. 1977). Capital One's Motion will be granted as to Count IV.

## CONCLUSION

For the foregoing reasons, Capital One's Motion for Summary Judgment will be GRANTED as to all counts. A separate Order shall issue.

Date: September 9, 2020



THEODORE D. CHUANG
United States District Judge